TIMOTHY PATRICK KIRBY ET AL. *v.*
C. D. HYLTON ET AL.

[No. 887, September Term, 1981.]

*Decided April 8, 1982.*

The cause was argued before LISS, █COUCH and BISHOP, JJ.

*Albert D. Brault,* with whom were *Janet S. Zigler* and *Brault, Graham, Scott & Brault* on the brief, for appellants.

*David A. Levin,* with whom was *W. Scott Sonntag* on the brief, for appellee Trenchcraft, Incorporated. *Robert C. Morgan,* with whom were *Roy L. Mason* and *Donahue, Ehrmantraut & Montedonico, Chartered* on the brief, for appellee First Maryland Utilities, Inc.

COUCH, J., delivered the opinion of the Court.

After their nine-year old son, Timothy, was fatally injured when run over by a heavy pipe, while rolling down a hill, on land owned by a water and sewer company, First Maryland Utilities (FMU), Donald and Dorothy Kirby brought suit in the Circuit Court for Prince George's County against FMU, a contractor, Trenchcraft, Inc., the developer of the housing development where the accident occurred, Hylton Enterprises, and C. D. Hylton and Irene Hylton. Following presentation of their case to a jury the trial judge (Mason, J.) ended the case by entering judgment in favor of the defendants, having granted motions for a directed verdict. Previously the Hyltons and Hylton Enterprises had been granted summary judgments. Appellants do not argue that the summary judgment motions were granted erroneously.

On appeal the Kirbys raise a host of issues concerning alternate theories under which they contend they were entitled to at least have the jury consider their case against FMU and Trenchcraft, Inc. They also contend the trial judge erred in certain of his evidentiary rulings.

### The Facts

In 1967, Hylton Enterprises began developing Marlboro Meadows, a single family home community in southern Prince George's County. It appears that the general pattern of the subdivision involved clusters of homes with open space surrounding the housing areas. Water and sewer service for the community had to be provided by the developer as there was no other such system available. Appellants allege that to accomplish this, Mr. Hylton caused FMU to be incorporated, and further allege that he was the sole stockholder. Whether this is true has no bearing on the case. In an open area beyond the dead end of Village Drive North, FMU established a water plant consisting of water tanks, which were enclosed by a fence, and two buildings, one having the appearance of a two story house, the other of a garage. There was evidence that when Mr. and Mrs. Kirby visited the development in 1968, they were shown a model upon which it was indicated that the open area referred to above could

be used as a play area for children. The Kirbys purchased a home on Village Drive North and, in 1969, moved in with their three children. The property of FMU was never delineated as separate from the designated open space by fencing or otherwise. There was evidence that the whole area was used by neighborhood children for the playing of tag and impromptu sports and that they built clubhouses by a nearby stream. On occasion the children would go into the water plant itself to buy soda from a dispensing machine. The two plant personnel, Taylor and Dodson, were known by and were friendly with the children. In 1973 FMU decided to build a lagoon below the water tank to handle a problem of excess lime being discharged into a stream below the plant. This involved installing drain pipes from the water tank to the lagoon; a contract was entered into with appellee Trenchcraft, Inc. for the job. Thereafter, the drain pipes were delivered to the property and placed on the ground outside the fence surrounding the water tanks. For some five weeks Trenchcraft, Inc. was occupied with other work and could not begin the lagoon project. There was evidence that during this time Mr. Taylor became aware that some of the pipes had been moved, despite being very heavy (1,850 pounds). He explained to some of the children that they could get hurt playing on the pipes. On October 23, 1973, as Mr. Taylor was leaving the plant to go pick up the mail, he observed some children below the plant building, pushing a pipe. According to him, he told them to leave and waited until they had done so. There was testimony from some children to the effect that they did not see Mr. Taylor that morning. In any event, it appears that Timothy and several other children (10 or more) pushed one of the pipes up an incline toward the dead end of Village Drive North. It was the intention of the children, having reached a terrace in the slope, to get inside the pipe and ride it down the hill. Unfortunately, Timothy, who had helped push the pipe up the hill, did not get inside the pipe or out of its way when it was pushed so that it would roll down the hill. The pipe ran over him causing fatal injuries. This suit ensued.

## Contentions

In the main, appellants contend:

1) there was sufficient evidence from which the jury could have found Timothy was an invitee on the FMU property;

2) there was sufficient evidence from which the jury could have found Timothy was a licensee by invitation;

3) FMU assumed a duty to act and the trial judge erred in not submitting that theory to the jury;

4) the trial judge erred in rejecting appellants' theory of strict liability;

5) the trial judge erred in not submitting to the jury their theory of liability based on violation of a statute;

6) the trial judge erred in directing a verdict in favor of Trenchcraft as there was evidence of a lack of due care on its part;

7) the trial court erred when it refused to permit the president of the appellee Trenchcraft to testify as to actions involving the pipes performed by the company following the accident;

8) the trial court erred in sustaining appellees' objections to exhibits offered by appellants to illustrate representations made by Hylton Enterprises concerning the cluster open space located beyond Village Drive North.

## The Law

### Issues 1 and 2

Judge Digges, speaking for the Court of Appeals in *Bramble v. Thompson,* 264 Md. 518, 287 A.2d 265 (1972), set forth the guides and standards to be followed in determining liability in a matter of this kind. He stated in pertinent part:

"The liability of owners of real or personal property to an individual injured on their property is dependent on the standard of care owed to the individual and that in turn is contingent upon a determination of the individual's status while on the property, *i.e.,* whether he is an invitee, licensee, or trespasser. An invitee is one invited or permitted to enter or remain on another's property for purposes connected with or related to the owner's business. The owner must use reasonable and ordinary care to keep his premises safe for the invitee and to protect the invitee from injury caused by an unreasonable risk which the invitee, by exercising ordinary care for his own safety, will not discover. *Morrison v. Suburban Trust Co.,* 213 Md. 64, 68-69, 130 A.2d 915 (1957); *Peregoy v. Western Md. R.R. Co.,* 202 Md. 203, 207, 95 A.2d 867 (1953). A licensee is one privileged by virtue of proper consent to enter for his own purpose or convenience onto another's property. There are two types of licensees, a bare licensee and a licensee by invitation. A bare licensee takes the property as he finds it and, like a trespasser, he is owed no duty by the owner except that he may not be wilfully or wantonly injured or entrapped by the owner once his presence is known. *Crown Cork and Seal Co. v. Kane,* 213 Md. 152, 157, 131 A.2d 470 (1957); *Carroll v. Spencer,* 204 Md. 387, 393, 104 A.2d 628 (1954); *Peregoy v. Western Md. R.R. Co., supra.* A licensee by invitation is a social guest who takes the premises as his host uses them. In general, the legal duty owed him by the host is to take the same care of the guest as the host takes of himself or members of his family. He must exercise reasonable care to make the premises safe for his guest or he must warn him of known dangerous conditions that cannot reasonably be discovered and which in fact are not discovered by the guest. *Telak v. Maszczenski,* 248 Md. 476, 237 A.2d 434 (1968);

> *Paquin v. McGinnis,* 246 Md. 569, 229 A.2d 86
> (1967). A trespasser is one who intentionally and
> without consent or privilege enters another's prop-
> erty. 1 Poe, *Pleading and Practice,* 326-27, § 247
> (6th ed. 1970); *Restatement (Second) of Torts,* § 158
> (1965). The only duty of care a property owner owes
> to a trespasser, even one of tender years, is to
> refrain from wilfully or wantonly injuring the
> intruder. *Mondshour v. Moore,* 256 Md. 617, 619,
> 261 A.2d 482 (1970) and cases cited therein." *Id.* at
> 521, 287 A.2d at 267.

We particularly note that these rules apply equally to
personalty and realty, a matter of some import here. As
Judge Digges later stated in *Murphy v. Baltimore Gas &
Electric Co.,* 290 Md. 186, 191, 428 A.2d 459, 463, n. 3:
"Whether the property being used is personalty or realty is
of no consequence in the present cases because it is clear that
the same common law rule applies to both types of property.
*Bramble v. Thompson,* 264 Md. 518, 521, 287 A.2d 265, 267
(1972); *Hensley v. Henkels & McCoy, Inc.,* 258 Md. 397, 411,
265 A.2d 897, 905 (1970) (and cases cited in each)."

The appellants urgently contend that Timothy was either
an invitee or licensee by invitation when upon FMU's land.
Be that as it may, we fail to see how that helps their cause
since it is abundantly clear that Timothy was a trespasser as
to the pipe — the very instrument which caused his death.
Being a trespasser, there simply was no duty upon either
Trenchcraft or FMU running to Timothy except not wilfully
to injure or entrap him.

Furthermore, assuming *arguendo,* that Timothy was
deemed to have been an invitee upon FMU's land, when he
and other children took the pipe from where it had been
stored and rolled it up the slope, clearly he exceeded the
scope of any invitation. In *Aravanis v. Eisenberg,* 237 Md.
242, 253, 206 A.2d 148, 154 (1965), the Court of Appeals
stated in part:

> "We have recognized that there may be a change
> of status, 'geographical or chronological', of one who

starts as an invitee. *Levine v. Miller,* 218 Md. 74, 79, 145 A.2d 418 (1958); *Pellicot v. Keene,* 181 Md. 135, 139, 28 A.2d 826 (1942); *Gordon Sleeprite Corp. v. Waters,* 165 Md. 354, 358, 168 Atl. 846 (1933). See *Restatement, Torts* § 343 Comment b (1932). While the cases cited deal with change of status from invitee to licensee, there is no reason in logic or justice, when circumstances warrant, why the transmutation ˙cannot be from licensee to invitee."

In *Levine v. Miller,* 218 Md. 74, 145 A.2d 418 (1958), the Court held that an injured child, who started out as an invitee upon another's land, had her status changed to that of a licensee and possibly to that of a trespasser because she simply had no invitation to use the property in the fashion she did when she was hurt. Thus, in the instant case, even if Timothy may have been an invitee on the land, clearly he had no invitation to use the pipes and, when he did, he became a trespasser. Viewing the evidence in a light most favorable to the appellants, as we must, *Impala Platinum, Ltd. v. Impala Sales (U.S.A.),* 283 Md. 296, 328, 389 A.2d 887, 906 (1978), there simply was no evidence of the breach of any duty owed to appellants' decedent and thus no liability on either appellee. We find no merit to this issue.

(3)

*Liability for assumption of duty*

The appellants next contend that FMU, through Taylor, had twice assumed a duty to act before the present incident and that it was a jury question whether that duty was carried out properly. While we have no quarrel with that proposition generally, *see Kemp v. Armstrong,* 40 Md. App. 542, 546, 392 A.2d 1161, 1164 (1978), *cert. denied,* 284 Md. 741 (1979) under the facts present here we do not believe it applies. The first time FMU is said to have voluntarily assumed to act was when Taylor became aware that someone had moved some of the pipes and that moving the

pipes was dangerous. Therefore, he and Dodson had moved them back to their original position. Apparently this had to be done two or three times. From this the appellants argue that the jury could have found the replacement and immobilization of the pipes was done improperly. We believe the *Kemp* principle is inapplicable here because the record reveals no evidence from which it can be concluded that Timothy or any of the children felt the actions of Taylor and Dodson were designed to make the area safe to play upon. Indeed, the area would have been safe if the children had not proceeded to remove one of the pipes again and roll it around. Furthermore, the principle upon which appellants rely is never applicable when there is a superseding cause by the acts of third parties such as Timothy and his friends. *See Peterson v. Underwood*, 258 Md. 9, 16, 264 A.2d 851, 855 (1970) ("[A]lthough an injury might not have occurred 'but for' an antecedent act of the defendant, liability may not be imposed if for example the negligence of one person is merely passive and potential, while the negligence of another is the moving and effective cause of the injury.") (citation omitted).

The second occasion FMU is supposed to have assumed a duty to act was earlier on the day of the incident when Taylor saw children playing with one of the pipes, told them to leave, and watched them do so before leaving to get his mail. From this appellants argue that a jury could have inferred Taylor did not act carefully in determining whether all the children had heard his warning before he left the area. This contention is specious in that there simply is no evidence that Taylor assumed the duty of making the drainage pipes safe for the children to play upon. When a landowner orders a trespasser off his property, the owner does not assume a greater duty to make the property safe than he would otherwise owe the trespasser.

(4)

### Strict liability

Appellants next contend that the appellees are liable on the basis of strict liability in tort. They correctly point out

that Maryland reaffirmed the viability of strict liability in *Yommer v. McKenzie,* 255 Md. 220, 257 A.2d 138 (1969). The doctrine of strict liability imposes upon anyone who, for his own purposes, creates an abnormal risk of harm, the duty to guard against that harm. *Restatement (Second) of Torts,* § 519, Comment d (1977). *Yommer* quoted § 520 of a tentative draft of the *Restatement (Second) of Torts:*

> "In determining whether an activity is abnormally dangerous, the following factors are to be considered:
>
> a) Whether the activity involves a high degree of risk of some harm to the person, land or chattels of others;
>
> b) Whether the gravity of the harm which may result from it is likely to be great;
>
> c) Whether the risk cannot be eliminated by the exercise of reasonable care;
>
> d) Whether the activity is not a matter of common usage;
>
> e) Whether the activity is inappropriate to the place where it is carried on; and
>
> f) The value of the activity to the community." *Id.* at 224, 257 A.2d at 140.

*Yommer* emphasized that the appropriateness of the activity in the particular place was the most crucial factor. *Id.* at 225, 257 A.2d at 141. "We accept the test of appropriateness as the proper one: that the unusual, the excessive, the extravagant, the bizarre are likely to be non-natural uses which lead to strict liability." *Id.* at 226, 257 A.2d at 141 (footnote omitted). The Court illustrated the appropriateness requirement by quoting from *Toy v. Atlantic Gulf & Pacific Co.,* 176 Md. 197, 213, 4 A.2d 757, 765 (1939):

> "So, it follows that if the escape be of oil, gas, electricity, explosives, sewage or water artificially accumulated and stored and damage is done to an adjacent property, the occupier is within the rule. In

these instances the occupier was not using the land in the common and natural way, and had artificially produced the potential danger whose presence and continuation may well be attributable to negligence, according to the relative circumstances, rather than to the doctrine of liability without fault."

The appellees interpret *Yommer* and *Toy* to mean that an owner of land is liable under the doctrine of strict liability only when something on his land *escapes* from his land onto the land of another, and does not apply when the instrumentality is harmless in and of itself, but is dangerous only when a third party's actions initiate the harm. The appellees argue that, in the instant case, the pipe never left the land and that it was harmless until the children rolled it up the hill.

We find that we need not address the issues of escape and intervention because we do not think that the storage of a pipe in the instant case is an abnormally dangerous activity according to the criteria set forth in § 520 of the tentative draft and quoted in *Yommer*.[1]

As the record makes clear, the storage of the pipe was not the kind of abnormally dangerous activity which was contemplated by *Yommer* and § 520. The activity did not involve a high risk of harm to others, which, if it occurred, was likely to be great and which could not have been eliminated by the exercise of reasonable care; the storage of pipe, in order to improve a residential water and sewage system, was neither totally uncommon to the neighborhood nor was it inappropriate to the particular place where it occurred; and it had at least some value to the neighborhood. The activity in this case, the storage of pipes to improve a residential water and sewerage system, is not in the same class as the activity in *Yommer* (large underground gasoline storage tank in close proximity to neighboring property

---

1. Restatement (Second) of Torts, § 520 (1977), sets forth the same criteria in slightly different wording as the tentative draft quoted in Yommer v. McKenzie, 255 Md. 220, 224, 257 A.2d 138, 140 (1969).

owner's source of well water was not a matter of common usage and involved an abnormally dangerous risk, 255 Md. at 224-225, 257 A.2d at 141). Because the activity did not entail an unreasonable risk of harm, the appellants must show negligence in order to recover and cannot rely on the doctrine of strict liability.

(5)

### Violation of Public Service Commission regulation

The appellants' next contention is that the trial judge erred in not allowing the jury to consider their theory of liability of FMU based on its violation of a regulation of the Public Service Commission. Title 20, subtitle 70 of these regulations, Chapter 08, subsection .01, provides:

> "Each utility shall exercise reasonable care to reduce the hazards to which its employees, its customers, and the general public may be subjected."

In *Osterman v. Peters,* 260 Md. 313, 316-17, 272 A.2d 21, 23 (1971), the Court of Appeals quoted from *State v. Longeley,* 161 Md. 563, 569, 158 A. 6, 8 (1932), wherein it had stated:

> " 'The ordinance in this case was passed for the benefit of the public. Any violation of it subjects the owner of a quarry to a fine. But, before an individual can hold such owner liable for an injury alleged to have resulted from such violation, there must be shown a right on the part of the plaintiff, a duty on the part of the defendant with respect to that right, and a breach of that duty by the defendant whereby the plaintiff has suffered injury. *Maenner v. Carroll, supra* [46 Md. 193 (1877)]. A trespasser can acquire no such right except in case of willful injury. The mere violation of a statute would not give it. The effect of such violation is only to raise a presumption of negligence in favor of one entitled

to assert it. See an interesting discussion in 27 *Harvard Law Review,* p. 333.' 161 Md. at 569-70."

In the instant case, while, arguably, Timothy initially may have been an invitee with relation to FMU's land, it is abundantly clear that as to the pipe he was a trespasser. Thus no right on the part of Kirby or duty on the part of FMU was created and the mere violation of the regulation did not create a right or duty. Accordingly, the court was correct in not submitting this theory to the jury.

### (6)

### *Liability of Trenchcraft*

What we have just said applies to the next contention of the Kirbys. Here they contend that because Timothy was an invitee as to the land, no lesser duty was owed him by Trenchcraft. We disagree that this appellee incurred any liability because, regardless of his status as to the land, Timothy was clearly a trespasser as to the pipes and thus no duty was owed him by Trenchcraft, except not to entrap him or willfully injure him, neither of which situations exist here. So far as the alleged building code violation is concerned, what was said in *Osterman, supra,* is applicable here.

### (7) and (8)

### *Evidentiary rulings*

Appellants' complaints with regard to two evidentiary rulings made by the trial judge are rendered moot by our conclusions above and need not be addressed.

There is yet another reason why we conclude there was no error in the trial court's direction of a verdict in favor of the appellees. In our view appellants' decedent was, as a matter of law, guilty of contributory negligence and/or assumed the risk of his actions. Both grounds were raised below in the appellees' argument on the motion for a directed verdict but

no decision on them was rendered because the court found there was no primary negligence. In any event,

> "In order to justify a holding that the plaintiff was guilty of contributory negligence as a matter of law, 'the evidence must show some prominent and decisive act which directly contributed to the accident and which was of such a character as to leave no room for difference of opinion thereon by reasonable minds.' *Baltimore & O.R.R. v. Plews,* 262 Md. 442, 454 (1971)."

*Rafferty v. Weimer,* 36 Md. App. 98, 107, 373 A.2d 64, 69 (1977). The test to be applied is whether the character of Timothy's conduct which led to his death was commensurate with the conduct of a reasonably prudent person under the circumstances. *See Witriol v. Pfueller,* 247 Md. 177, 180, 230 A.2d 346, 347-48 (1967). The standard in this case is the standard of care that a reasonably prudent child of the same age, experience, and intelligence as Timothy would use under the circumstances. *Taylor v. Armiger,* 277 Md. 638, 645-46, 358 A.2d 883, 889 (1976).

> "[A] plaintiff is said to have assumed the risk of injury when, with full knowledge and understanding of an obvious danger, he voluntarily abandons his right to complain by exposing himself to that particular risk. *Kasten Constr. Co. v. Evans,* 260 Md. 536, 544, 273 A.2d 90 (1971); *Gibson v. Beaver,* 245 Md. 418, 421, 226 A.2d 273 (1967); *Bull Steamship Lines v. Fisher,* 196 Md. 519, 525-26, 77 A.2d 142 (1950)." *Hooper v. Mougin,* 263 Md. 630, 633, 284 A.2d 236, 238 (1971).

Children only assume the risk of dangers whose existence they either know or should know, exercising the standard of care of a reasonably prudent child of the same age, experience, and intelligence. *Taylor v. Armiger,* 277 Md. at 646, 358 A.2d 238. While the distinction between contributory negligence and assumption of risk is a fine one, "assumed risk implies intentional exposure to a known danger, which

may or may not be true of contributory negligence." *Sacks v. Pleasant,* 253 Md. 40, 46, 251 A.2d 858, 862 (1969) (citing cases).

Assuming the truth of all the appellants' credible evidence, and all inferences fairly deducible therefrom, *Impala Platinum, Ltd. v. Impala Sales (U.S.A.),* 283 Md. 296, 328, 389 A.2d 887, 906 (1978), we think that reasonable minds could not differ in concluding that Timothy appreciated the obvious dangers, which, unfortunately, came to fruition, attendant to pushing a 1,850 pound drainage pipe up an incline and, therefore, assumed the risk and its consequences. In the alternative, we think that reasonable minds could not differ in concluding that a reasonably prudent child of the same age, experience, and intelligence as Timothy would not have pushed such a heavy object up a hill because of the obvious danger of it rolling back downhill without him having time to get out of the way, and was, therefore, contributorily negligent.

*Judgment affirmed; costs to be paid by appellants.*